**Deborah Ann STAS, Petitioner**

v.

**PENNSYLVANIA SECURITIES COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2006.

Decided Nov. 3, 2006.

Edwin L. Stock, Reading, for petitioner.

Theodore R. Mann and Ralph S. Snyder, Philadelphia, for respondent.

BEFORE: FRIEDMAN, Judge, and COHN JUBELIRER, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Deborah Ann Stas (Petitioner) petitions for review of an order of the Pennsylvania Securities Commission (Commission), which found that she violated Sections 201 and 401(a)-(c) of the Pennsylvania Securities Act of 1972(Act).[1] The Commission: (1) barred Petitioner, for a period of ten years, from representing to the public that she is an issuer who offers or sells securities in the State, registering as a broker-dealer, agent, investment advisor, investment advisor representative, or affiliate of any such person, and relying on an exemption from registration; (2) ordered Petitioner to offer rescission to Anna and Harold Bauscher and Karen and Robert Turner for the full amount of their principal and interest due under their respective agreements with Petitioner; and (3) ordered Petitioner to pay $15,357.96 to the Commonwealth, which represents the costs for investigation and legal fees. Discerning no error, we affirm.

The Commission found the following facts. At all material times, Petitioner resided in Pennsylvania. From June, 1996 to February, 1999, Petitioner was a registered agent for Walnut Street Securities, Inc. Beginning in February, 1999, Petitioner entered into agreements with Pennsylvania residents, Anna and Howard Bauscher, and their daughter and son-in-law, Karen and Robert Turner, whereby Petitioner obtained from them at least $521,115.93.[2] The agreements were variously named as Private Investment Placement Agreements, Private Tax Free Agreements, or Private Agreements (collectively referred to as "Agreements").[3] Petitioner agreed to pay the parties interest rates ranging from nine percent to twenty percent per annum, which Petitioner told them would be "tax-free."[4] The Agreements' durations ranged from six months to five years, as follows:

| Date | Investor | Amount | Annual Interest Rate | Term |
|------|----------|--------|----------------------|------|
| February 10, 1999 | Bauscher | $ 70,438.00 | 9% | 5 years |
| August 10, 1999 | Bauscher | $ 54,844.93 | 10% | 5 years |
| August 10, 1999 | Bauscher | $ 50,000.00 | 10% | 5 years |
| May 3, 2000 | Bauscher | $ 66,408.00 | 10% | 5 years |
| June 10, 2000 | Bauscher | $ 79,385.00 | 10% | 5 years |
| November 27, 2000 | Bauscher | $ 50,000.00 | 10% | 5 years |
| April 24, 2001 | Turner | $140,000.00 | 10% | 5 years |
| October 30, 2001 | Turner | $ 10,000.00 | 20% | 6 months |

1. Act of December 5, 1972, P.L. 1280, *as amended*, 70 P.S. §§ 1–201, 1–401(a)–(c).

2. Prior to entering these Agreements, Petitioner sold mutual funds, life insurance, and long-term care policies to the Bauschers. (Hr'g Trans. at 13, 88)

3. The Commission found the Agreements were: (a) not registered under Section 201 of the Act, 70 P.S. § 1–201; (b) not exempt from registration under Section 202 of the Act, 70 P.S. § 1–202; and (c) not federally covered securities. Further, the securities transactions relating to the Agreements were not exempt from registration under Section 203 of the Act, 70 P.S. § 1–203. (Commission Findings of Fact (FOF) ¶ 4.)

4. The Commission found that Petitioner made an untrue statement of material fact to the Pennsylvania residents that the interest payments would be tax-free. (FOF ¶ 2.)

(FOF ¶ 2.)

Petitioner placed the proceeds into various accounts under her control, commingling them with personal funds in her personal bank accounts and her personal brokerage trading accounts. Also, Petitioner used the proceeds obtained from the Bauschers and Turners to: (1) purchase a swimming pool and landscaping services; (2) eliminate her credit card debt; (3) purchase stock for cash; and (4) pay margin obligations following her purchases of stock on the margin.

On August 29, 2001, Petitioner wrote a letter to the Bauschers attempting to explain why she failed to make a $21,652.60 interest payment. In the letter, Petitioner offered the Bauschers an additional "tax-free" 5% interest payment if they allowed her six more months to make the overdue payment, adding that "5% in six months is really good with no taxes especially." [5] Petitioner also referred to a non-existent associate in the letter. In early 2002, Petitioner filed a Chapter 7 Bankruptcy Notice, listing the Bauschers as creditors in the amount of $371,115 and the Turners as creditors in the amount of $145,000. (Trans.Ex. C12.)

On May 23, 2003, the Commission issued an Order to Show Cause alleging that Petitioner violated the Act. On October 5, 2004, a hearing officer conducted an administrative hearing. At the hearing, the Commission offered documentary evidence and the testimony of Petitioner, Commission Securities Examiner Zachary Ortenzio, and Commission Securities Investigator Howard Eissler. Petitioner offered documentary evidence and her own testimony. On March 16, 2006, the Commission issued its Findings of Fact, Conclusions of Law, and Order.

First, the Commission found the Agreements were "securities" within the meaning of Section 102(t) of the Act, 70 P.S. § 1–102(t), and Petitioner was an "issuer" of these securities within the meaning of Section 102(*l*) of the Act, 70 P.S. § 1–102(*l*). By selling the securities to the Bauschers and Turners, Petitioner offered and sold securities in Pennsylvania in willful violation of Section 201 of the Act, 70 P.S. § 1–201. Further, the Commission found Petitioner wilfully violated Section 401(a)-(c) of the Act, which define categories of fraud in the sale and purchase of securities. Supporting the Commission's conclusions, the evidence included: (1) Petitioner's unauthorized use of the proceeds to purchase personal luxury items, stocks on margin, and margin obligations; (2) Petitioner's false statements that represented her interest payments to the Bauschers and Turners as tax-free; and (3) Petitioner's repeated reference to a non-existent associate.

■ Petitioner appeals to this Court,[6] presenting four issues for review: (1) whether the Agreements were "securities" within the meaning of Section 102(t) of the Act; (2) whether Petitioner was an "issuer" of the securities under Section 102(*l*) of the Act; (3) whether Petitioner violated Section 201 of the Act, which prohibits the selling of unregistered securities; and (4) whether Petitioner violated subsections

---

**5.** The Commission found that this statement constituted an untrue statement of material fact. (FOF ¶ 6.)

**6.** This Court's review of an appeal from an administrative agency action is limited to "a determination of whether constitutional rights have been violated, errors of law have been committed, or whether the findings of an agency are supported by substantial evidence." *Cola v. State Civil Serv. Commission,* 861 A.2d 434, 436 (Pa.Cmwlth.2004).

(a)-(c) of Section 401 of the Act. Petitioner also questions whether the Commission was required to produce the testimony of the victims.

This Court must decide, first, whether the Commission erred in determining that the Agreements were "securities" within the meaning of Section 102(t) of the Act. Petitioner argues that the Agreements were not securities, characterizing them, instead, as personal loans between close friends who were "almost like family." (Petitioner's Br. at 18) The Commission argues that the Agreements were securities under the Act, whether defined as "investment contracts" or "evidences of indebtedness." (Commission's Br. at 3.)

■ "Unless the context otherwise requires," the definition of securities under the Act includes an "investment contract." 70 P.S. § 1–102(t). Pennsylvania courts have adopted the United States Supreme Court's definition of an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Martin v. ITM/International Trading & Marketing Ltd.* 343 Pa.Super. 250, 494 A.2d 451, 453 (1985) (quoting *S.E.C. v. Howey,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)); *see also Feninger v. Capital Accumulations Servs., Inc.,* 2 Pa. D. & C.4th 339, 343–45 (C.C.P. Delaware 1989) ("*Howey* test"). The *Howey* test comprises three elements. First, there must be an investment of money. *See Howey,* 328 U.S. at 298–99, 66 S.Ct. 1100. Second, that investment must be in a common enterprise, which means that returns on the investment depend on the efforts of the promoter or a third party. *See id.* at 300, 66 S.Ct. 1100. Third, the investor must

expect profits "solely from the efforts of the promoter or a third party." *Id.* at 299, 66 S.Ct. 1100.

■ Petitioner claims that the common enterprise element is absent here because Petitioner failed to solicit investors; she merely entered into a loan agreement. The Commission contends that the facts satisfied all of the *Howey* elements. First, the Bauschers and Turners invested their monies pursuant to contracts, specifically the Agreements. The parties entered into a "common enterprise" with Petitioner since their returns depended upon her expertise and effort. Finally, the parties expected profits—interest in the aggregate of more than $250,000 over a period of five years, and perhaps profits on the stock as well—solely from the efforts of Petitioner.

The Commission correctly found that the Agreements are securities. This case is similar to *Martin,* where the Superior Court followed the *Howey* test. There, the appellant invested $18,000 in an agreement to purchase gold bars, hoping to receive 25% of the profits. The agreement did not require him to perform any duties, and it specifically indicated that he was not a partner. Thus, the court held the agreement to be an investment contract and, therefore, a security under the Act. Likewise, in this case, the Bauschers and Turners invested more than $500,000 into the Agreements, with the hope of enjoying various interest rates along with the increased value of the investment. They were not required to perform any duties, and they relied solely on the efforts and expertise of the Petitioner to purchase stock. Accordingly, the Agreements are investment contracts and, therefore, securities within the meaning of Section 102(t) of the Act.[7]

7. Since this Court finds the Agreements were "investment contracts," we need not address whether the Agreements are "evidences of indebtedness."

■ We next address whether the Commission correctly concluded that Petitioner was an "issuer" of the Agreements within the meaning of Section 102(*l*) of the Act. This is critical for Petitioner because the Commission may require rescission under Section 513 of the Act, 70 P.S. 1–513, only when an "issuer" violates either Section 201 or 401 of the Act. Section 102(*l*) of the Act defines "[i]ssuer" as "any person who issues or proposes to issue any security . . . ." 70 P.S. § 1–102(*l*). Petitioner argues that, in her case, she was not an "issuer" because she merely wrote an agreement to memorialize a loan from the Bauschers to her.

We have found no case-law which has applied the Act's definition of an "issuer." Nevertheless, Black's Law Dictionary defines an "issuer" as "[a] person or entity (such as a corporation or bank) that issues securities, negotiable instruments, or letters of credit." *Black's Law Dictionary* 850 (8th ed.2004). It further defines "to issue" as "[t]o send out or distribute officially." *Id.* Under the definitions found in the Act and Black's Law Dictionary, Petitioner is an issuer. Petitioner officially distributed securities that she created, in the form of Agreements, offering and selling them to the Bauschers and Turners.

■ Third, we determine whether Petitioner violated Section 201 of the Act. Section 201 of the Act, 70 P.S. § 1–201, provides that "[i]t is unlawful for any person to offer or sell any security in this State unless the security is registered under this act" or exempt from registration. The Commission found that "[b]y selling said securities to the Bauschers and Turners, [Petitioner] offered and sold securities in *willful* violation of Section 201 of the [Act]." (Commission Conclusions of Law (COL) ¶ 3) (emphasis added). Petitioner argues that she did not wilfully violate Section 201 because she did not believe

that the Agreements amounted to securities requiring registration. The Commission counters that Section 201 of the Act does not require wilfulness. Also, the Commission notes that Petitioner has never claimed exemption from registration. Even if Section 201 of the Act does require wilfulness, the Commission continues, the definition of "wilful" under the Act only requires "that the person acted intentionally in the sense that [she] intended to do the act and was aware of what [she] was doing." 70 P.S. § 1–102(w)(1). Pursuant to this definition, Petitioner was aware that she received large amounts of money in exchange for Agreements specifically denominated as "investments."

The parties' confusion regarding whether Section 201 requires wilfulness is understandable. Section 201 defines a prohibited practice without indicating either the sanction for violation or the standard of conduct required for the imposition of a sanction. As this Court noted in *Ardolino v. Pennsylvania Securities Commission*, 145 Pa.Cmwlth. 40, 602 A.2d 438, 440–41 (1992), the sections of the Act defining prohibited practices do not indicate the standard by which the violator's conduct should be measured. It is the enforcement provisions of the Act that contain both the sanctions for violations and the standards of conduct necessary for imposing sanctions. Section 513, 70 P.S. § 1–513, the relevant enforcement provision here, specifies the sanction for a Section 201 violation and the standard of conduct necessary for imposing such a sanction. Section 513 provides that "where [the Commission] has determined that an issuer *wilfully* violated section 201 or 401" the Commission may require the issuer "to effect a rescission offer." 70 P.S. § 1–513 (emphasis added). Therefore, to impose the rescission sanction of Section 513 for a

Section 201 violation, the Commission must find an issuer *wilfully* violated Section 201.

Since a wilful violation of Section 201 of the Act is necessary for the imposition of the rescission sanction under Section 513 of the Act, this Court must decide whether Petitioner wilfully violated the section by offering or selling unregistered securities. "As used in all sections of the Act except section 511 with respect to a wilful violation of section 401(a)," [8] wilfulness under the Act [9] means "that the person acted intentionally in the sense that the person intended to do the act and was aware of what the person was doing." Section 102(w)(1) of the Act, 70 P.S. § 1–102(w)(1). "Proof of evil motive or intent to violate the act or knowledge that the person's conduct violated the act is not required." *Id.*

Here, Petitioner wilfully violated Section 201. The Act requires neither the intent nor knowledge of Petitioner that her conduct violated the Act. All it requires is that she was aware of what she was doing. According to her own testimony, Petitioner intended to offer and sell the Agreements without registering them. While she apparently did not believe that the Agreements were securities requiring registration, she was aware that the Agreements were denominated as "investments" and that she offered them to the Bauschers in

return for large amounts of money. Despite what Petitioner apparently believed, as this Court observed in *Ardolino*, Petitioner "had to have known" what she was doing.

■ The fourth issue before the Court is whether the Commission correctly concluded that Petitioner violated subsections (a)-(c) of Section 401 of the Act. Again, the Commission found that Petitioner *wilfully* violated these subsections. (COL ¶ 4–6). Petitioner argues that there is no substantial evidence to support the Commission's conclusion. Under our standard of review, we must determine whether there is substantial evidence in the record presently before us to support the Commission's findings of fact. *Ardolino*, 602 A.2d at 439. "Substantial evidence is that evidence which a reasonable person might accept as adequate to support the conclusion reached." *Id.* at 439–40.

Section 401 and its three subsections define fraudulent sales and purchases of securities under the Act. Section 401 provides as follows:

> It is unlawful for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly:
>
> (a) To employ any device, scheme or artifice to defraud:

**8.** Section 511 of the Act, 70 P.S. § 1–511, concerns criminal, not civil, sanctions.

**9.** Prior to amendment in 2002, the Act did not define "wilful." Nevertheless, this Court has considered the issue of wilfulness under the Act before. In *Ardolino v. Pennsylvania Securities Commission*, 145 Pa.Cmwlth. 40, 602 A.2d 438 (1992), the Commission found that a securities agent violated Section 407(a) of the Act because he made false or misleading statements in Commission filings. 70 P.S. § 1–407. On appeal, the securities agent argued that the Commission's finding was erroneous because it failed to prove that he *knowingly* made the false or misleading statement

in his filings. The agent explained that his attorney prepared all the documents, including the affidavits, and that he signed them without knowing what they contained. This Court held the agent's actions were wilful. Though the Act did not define "wilful" at that time, the Court observed that the Criminal Code equated the term with "knowing." The court found that the securities agent signed and filed the affidavits stating that he had sent the rescission letters to the investors when, in fact, he had not. Thus, the agent "had to have known" that he did not actually send the letters. *Ardolino*, 602 A.2d at 441.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

70 P.S. § 1–401.

The Commission found that Petitioner wilfully violated Section 401(a) by: selling securities to the Bauschers and Turners and using most of the proceeds to make unauthorized personal purchases; paying margin obligations following unauthorized purchases of stock on margin; falsely telling them that her interest payments to them would be tax-free; and repeatedly referring to a non-existent associate.

The Commission also found that Petitioner wilfully violated Section 401(b) by falsely stating that the interest she paid would be tax-free, and by selling the securities without disclosing to the Bauschers and Turners that: (1) they were not registered or exempt from registration with the Commission; (2) some of the proceeds were being used to make personal purchases of luxury items; (3) stocks were being purchased on margin, (4) margin purchases retained risks; and (5) some of the proceeds were being used to pay margin calls.

The Commission further found that the unauthorized uses of the invested funds, the material omissions, and the misstatements, which caused losses of $521,115.93 to the Bauschers and Turners violated section 401(c).

Petitioner argues that her "credible and uncontradicted" testimony demonstrates that the Bauschers and Turners knew and understood her plan for the money and the general status of the stock investments she made. (Hr'g Trans. at 26; 91; 93–97; 99; 101; 107–08; 111; 112; 115; 117; 118–19; 122; 124). Her testimony, Petitioner asserts, showed that she had been "like . . . a daughter" to the Bauschers, and that the family decided to help her out of financial difficulties following a divorce. (Hr'g Trans. at 15; 91–95). According to Petitioner, she invested some of the money in the stock market at the suggestion of Anna Bauscher. (Hr'g Trans. 16; 37; 40). Petitioner also claims that, though she had a basic understanding of mutual funds, her knowledge of trading stocks was virtually non-existent. (Hr'g Trans. at 40–41; 97).

Further, Petitioner claims that the record shows the Bauschers knew some of the loan moneys would be used for personal purchases and meeting margin calls. At the hearing, Petitioner testified that she did not tell the Bauschers about every wire transfer or margin payment because "[t]hey didn't want to know every little detail. They just gave me the money and said, 'This is what we want back for it, and give it back in five years.'" (Hr'g Trans. at 113–14). Also, Petitioner argues that she and Joanne Kalback, a daughter of the Bauschers, fabricated the non-existent associate to placate the Bauschers regarding their overdue interest payments. (Hr'g Trans. at 29–30). Finally, Petitioner claims, for the first time in her brief, that the evidence regarding the alleged tax-free nature of the loans indicates an "understanding" between the Bauschers and Petitioner, rather than an incentive for the Bauchers to loan the money.

The Commission argues its findings are supported by substantial evidence in the record. First, Petitioner made unauthorized personal purchases, as Petitioner testified that the funds were meant to pay off debt and purchase stock. (Hr'g Trans. 16–

17; 91, 94–95, 99, 112). Second, Petitioner paid margin obligations following unauthorized purchases of stock on margin, without any discussion with the Bauschers on whether to purchase stocks on margin. (Hr'g Trans. at 136–37). Also, Petitioner never discussed with the Bauschers her spending for personal reasons and the placement of some funds in a securities account. Petitioner unilaterally decided to divide the funds. (Hr'g Trans. at 99). Third, Petitioner falsely told the Bauschers that her interest payments to them would be tax-free, evidenced by Petitioner's notes during the Agreements and her August 29, 2001 letter. (Trans. Ex. C6 (stating "66,408.00 will be in private *tax-free* investment"); Trans. Ex. C8 (stating "and then I will get together with you to add this to your *tax-free* portfolio"); Trans. Ex. C11 (stating "I know that 5% in 6 mo[nths] is really good with *no taxes* especially") (emphasis added).)

Particularly, the Commission emphasizes the fraud inherent in Petitioner's sale of allegedly "tax-free" investments. In reply to Petitioner's position that the alleged tax-free nature of the loans was merely an "understanding" between the parties, the Commission argues that this "understanding" constituted a significant part of the fraud and deceit by Petitioner "on any person" under Section 401(c). Petitioner's false statements induced the Bauschers into providing her with the funds.

After a careful review, this Court finds substantial evidence in the record to support the Commission's conclusion. Petitioner wishes this Court to accept her version of the facts. However, this Court's scope of review on appeal is limited to finding whether the Commission's findings of fact are supported by substantial evidence. *Ardolino*, 602 A.2d at 442. Faced with a securities agent offering a different version of the facts, this Court, in *Ardoli-*

*no*, recognized that "[t]he Commission did not find that the events transpired that way and we are unable to make new findings of fact on appeal." *Id.* In this case, the Commission did not find any of the facts that Petitioner wishes us to adopt. We decline to do so here.

■ Regarding the wilfullness of Petitioner's actions, the Commission argues that Section 102(w)(1) requires only that her actions in selling the securities were voluntarily undertaken. We agree. Petitioner's fraudulent actions "in connection with" the offer and sale of the Agreements were wilful as defined under the Act. Petitioner voluntarily committed the acts, and she should have been aware of them. First, Petitioner testified that she did not discuss the personal, luxury, or stock on margin purchases with the Bauschers. Second, though she testified that she had full discretion in how she used the loan monies, Petitioner also testified that the loans were meant to satisfy debt and to purchase stock. Third, while Petitioner claims that the alleged tax-free nature of the interest payments was merely an "understanding" between the parties, she does not claim that the interest payments were, in fact, tax-free. Finally, Petitioner admitted at the hearing that she referred to a non-existent associate. Patently, Petitioner knew of her actions, and her actions were voluntary. There is more than enough evidence to support a finding of wilfulness in her fraudulent sale of the securities.

■ Finally, we must decide whether the Commission needed to produce the Bauschers or Turners as witnesses. Petitioner repeatedly asserts in her brief that the Bauschers and Turners should have testified. While substantial evidence must support the Commission's conclusions, the evidence need not be testimony of the victims. The Commission is not required

**134**

to subpoena any witnesses, let alone certain witnesses. It "may" do so in its discretion. *See* Section 510 of the Act, 70 P.S. § 1–510.

Based on the foregoing opinion, we affirm the order of the Commission.

### ORDER

**NOW,** November 3, 2006, the order of the Pennsylvania Securities Commission in the above-captioned matter is **AFFIRMED.**